UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIM. NO. 14-289(8) (SRN/JSM)

Plaintiff,

v.                              **REPORT AND RECOMMENDATION**

EDUARDO PENALOZA-ROMERO,

Defendant.

The above matter came before the undersigned on defendant's Pre-Trial Motion

to Suppress Evidence Seized Pursuant to Search Warrants.  [Docket No. 146].  Allen A.

Slaughter, Esq. appeared on the Government's behalf.   Robert M. Paule, Esq.

appeared on defendant's behalf.

This matter has been referred to the undersigned Magistrate Judge for a Report

and Recommendation by the District Court pursuant to 28 U.S.C. §636(b)(1)(A), (B),

and Local Rule 72.1(c).

I.      **PROCEDURAL BACKGROUND**

On September 23, 2014, the United States filed a superseding indictment against

several defendants alleged to be involved in a narcotics conspiracy.   Superseding

Indictment [Docket No. 15].  Eduardo Penaloza-Romero was indicted on one count of

Conspiracy to Distribute Methamphetamine and Marijuana, three counts of Distribution

of Methamphetamine, and one count of Distribution of Marijuana.  Id., pp. 2-3, 5-6, 8,

10.

Penaloza-Romero sought to suppress evidence seized pursuant to search

warrants for the following: Penaloza-Romero's residence and associated garage and

storage located at XXX Pleasant View Drive N.E, Spring Lake Park, Minnesota,

("residence"), which was searched twice on September 24, 2014; Penaloza-Romero's Auto Laser business ("business") located at XXX Sunset Road N.E., Spring Lake Park, Minnesota, which was searched twice on September 24, 2014; and the contents of various electronic devices seized in connection with the initial searches of the residence and business.   Defendant's Motion to Suppress Evidence ("Def.'s Mot."),[1] pp. 1-4 [Docket No. 221];[2] Gov't Exs. 8, 9 (applications and search warrants for search of the residence); 7, 10 (applications and search warrants for search of the business); 11, 12 (applications and search warrants for search of the contents of electronic devices).   In addition, he sought to suppress evidence obtained as a result of the Government's wiretap investigations in connection with Target Telephones #4 and #5.  Def.'s Mot., pp. 2-3; Gov't Exs. 4, 5.

Penaloza-Romero initially stated that the search warrant applications for the residence did not establish probable cause, and there was an insufficient nexus between the residence and narcotics trafficking; there was no probable cause to search the business; because the searches of the residence and business that yielded the electronic devices were illegal, the searches of the contents of the devices were also illegal; and the wiretaps should be suppressed because the Government had failed to establish that it had exhausted other methods of obtaining the evidence gained through the wiretaps.  Def's Mot., pp. 1-2.

The Government objected to what it characterized as Penaloza-Romero's vague

---

[1]     Penaloza-Romero did not submit a supporting memorandum of law with his initial motion.

[2]     Penaloza-Romero also moved to suppress the Government's search of the non-public portion of his Facebook account.   Motion to Suppress Evidence, p. 2.   He withdrew this part of the motion at the hearing on March 19, 2015.

and generalized motion, which failed to provide any factual analysis and no supporting memorandum.   Government's Consolidated Response to Defense Suppression Motions, pp. 6-11, 15 [Docket No. 192].   The Court agreed that the motion provided insufficient information regarding Penaloza-Romero's specific objections to the warrants and wiretaps and ordered Penaloza-Romero to file and serve a supplemental brief and the Government to respond to the supplemental pleading.   Court Minutes [Docket No. 206]; Order Granting Extension of Time To File and Serve a Supplemental Memorandum [Docket No. 222].   The parties complied with the Court's directive.

## II.   SUPPRESSION OF EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS

### A.   <u>Factual Background</u>

#### 1.   September 23, 2014 Warrants

On September 23, 2014, the Government obtained warrants to search Penaloza-Romero's residence and business, and they were executed on September 24, 2014. Gov't Exs. 7, 8.   Special Agent Travis Hamblen supplied the affidavits accompanying the warrants, which were identical for the applications for the search warrants of both the residence and business.   <u>Id.</u>

The affidavits stated the following facts.   Special Agent Hamblen has been a federal law enforcement officer since 1996, and for the past five years has been assigned to the Drug Enforcement Administration as a Task Force Agent in Minneapolis.   <u>Id.</u>, ¶ 1.   Since August, 2011, law enforcement had been involved in a controlled substance distribution investigation of the Penaloza Drug Trafficking Organization ("Penaloza DTO"), which is composed of members of the Penaloza family. <u>Id.</u>, ¶ 8.   The Penaloza DTO is responsible for the large scale distribution of

methamphetamine, cocaine, and marijuana in Minnesota and elsewhere in the United States. Id. At the time of the search warrant applications, the investigation was focused on the narcotics trafficking and money laundering activities of three members of the Penaloza family: Penaloza-Romero, Imer Penaloza and Eleuterio Izazaga-Pascacio.[3] Id., ¶ 9. Law enforcement had already seized approximately $600,000 in United States currency, forty-seven pounds of methamphetamine, ten pounds of marijuana, a handgun, and had conducted nine controlled substance purchases from Penaloza DTO associates. Id.

Penaloza-Romero is a known leader, supervisor, and organizer within the Penaloza DTO. Id., ¶ 39. Special Agent Hamblen stated that Auto Laser is an automotive repair business operated by Penaloza-Romero. Id., ¶ 23. During the course of the investigation of the Penaloza DTO, the Government had determined that although the business appeared to have some legitimacy, Penaloza-Romero was using the business as a front for narcotics trafficking. Id. Through on-going surveillance efforts over a year-and-a-half, the Government repeatedly observed that the business was used to store or transfer methamphetamine, and it had intercepted calls in which Penaloza-Romero directed Penaloza DTO associates to meet him at the business to collect drug-related proceeds. Id. For example, on June 26, 2014, law enforcement conducted surveillance of Izazaga-Pascacio, Imer Penaloza, Penaloza-Romero and the

---

[3]     Special Agent Hamblen's affidavits refer to Izazaga-Pascacio as Izazaga. The Superseding Indictment lists the name as "Izazaga-Pascacio." Therefore, the Court refers to this defendant as "Izazaga-Pascacio." Similarly, the affidavits refer to Eduardo Penaloza-Romero as "Penaloza." The Superseding Indictment refers to him as "Penaloza-Romero," and, therefore, the Court refers to this defendant as "Penaloza-Romero."

business.  Id., ¶ 24.  Law enforcement intercepted a call between an unidentified male and Imer Penaloza, during which Imer Penaloza, speaking in code, ordered two pounds of methamphetamine from an unidentified Spanish-speaking male.  Id., ¶ 25.  A short time later, law enforcement intercepted a series of phone calls between the unidentified male and Imer Penaloza in which the parties discussed a meeting location and gave directions to each other's locations.  Id., ¶ 27.  During this time, law enforcement was conducting surveillance of Imer Penaloza.  Id.  Law enforcement then intercepted a phone call between Imer Penaloza and Izazago-Pascacio, during which Izazaga-Pascacio asked about Imer Penaloza's current location and Imer Penaloza told Izazaga-Pascacio the he was just about to get out of his vehicle to meet a "connector."

Id.  Special Agent Hamblen described the subsequent events as follows:

> Law enforcement contemporaneously saw Imer Penaloza meet with an unidentified Hispanic male, at which time Imer Penaloza was seen placing a package in the trunk of Imer Penaloza's black BMW.
>
> Imer Penaloza and the unidentified Hispanic male then departed and Imer Penaloza was observed meeting with Izazaga[-Pascacio] and travelling in tandem with Izazaga[-Pascasio]'s vehicle to Auto Laser.  Imer Penaloza and Izazaga[-Pascacio] then departed their respective vehicles and entered Auto Laser on foot.  A short time later, law enforcement saw Eduardo Penaloza[-Romero], Imer Penaloza and Izazaga[-Pascacio] exit the shop.  Izazaga[-Pascacio] and Imer Penaloza then departed the area in Izazaga[-Pascacio]'s vehicle.  Law enforcement then saw Eduardo Penaloza[-Romero] drive Imer Penaloza's black BMW into the Auto Laser shop.  A law enforcement officer then drove by the open bay door of Auto Laser and saw that Eduardo Penaloza[-Romero] had opened the trunk of the black BMW once inside the shop.  A short time later Eduardo Penaloza[-Romero] drove the black BMW out of the shop and parked it in the common parking lot.  Later the same day, law enforcement saw Imer Penaloza return to the area of the Auto Laser and drive away in the black BMW.

5

Id.,¶ 28.   Subsequently, an intercepted call corroborated that Imer Penaloza and Izazaga-Pascacio had delivered two pounds of methamphetamine to Penaloza at the business.  Id., ¶¶ 29-32.

On July 1, 2014, law enforcement conducted a surveillance of Imer Penaloza and Izazaga-Pascacio at the residence.  Id., ¶ 40.  A law enforcement officer watched as Imer Penaloza and Izazaga-Pascacio left the residence, each carrying an envelope; both were later seen counting money, which was believed to have been in the envelopes.  Id.  After leaving the residence, Imer Penaloza and Izazaga-Pascacio drove to Imer Penaloza's apartment where they were seen transferring a cardboard box from Imer Penaloza's black BMW to Arnoldo Almendarez, another co-defendant in this case.[4] Id.  Shortly thereafter, law enforcement conducted a traffic stop of Almendarez and determined that the box contained bundles of marijuana.  Id.

In the latter part of July, 2014, law enforcement intercepted a series of phone calls between Penaloza-Romero and Alfredo "Rito" Hasurto-Herrera,[5] a known source of methamphetamine to the Penaloza DTO.  Id., ¶ 33.  During these calls, arrangements were made for the shipment of a non-specific quantity of methamphetamine by Rito and his associates from California to Minnesota.  Id.

On August 3, 2014, law enforcement intercepted a call between Penaloza-Romero and Rito.  During this call, Rito advised Penaloza-Romero that the load driver

---

[4]     On April 21, 2014 Almendarez pled guilty to Count One of the Superseding Indictment, Conspiracy to Distribute Methamphetamine and Marijuana.  [Docket No. 242].

[5]     "Rito" Basurto-Herrera was recently arrested in Fresno, California and is in the process of being transported to this District.  See Letter to the District Court, April 17, 2015 [Docket No. 239].

would be arriving soon and Penaloza-Romero needed to provide the address to which the load driver would deliver the methamphetamine.  Id., ¶ 35.  Penaloza-Romero agreed to send a text message with the address.  Id.  Law enforcement then intercepted a text message from Penaloza to Rito directing the delivery of methamphetamine to "8301 sunset rd spring lake park mn 55432," the address of the business.  Id.,¶¶ 35. Special Agent Hamblen believed the text message was intended to direct Rito to deliver the methamphetamine to the business.  Id.

Special Agent Hamblen stated:

> On August 5, 2014, law enforcement conducted a traffic stop of the vehicle sent to Minnesota by Rito from California.  Law enforcement subsequently located and seized 10 pounds of methamphetamine within the vehicle.  Subsequent intercepted calls confirmed that the seized methamphetamine from such traffic stop was in fact the methamphetamine which Eduardo Penaloza requested to be delivered to Auto Laser.

> Through years of surveillance of Auto Laser, I have determined that there is a small volume of legitimate automobile repair that occurs at Auto Laser.  However, it is my belief that Auto Laser is a "front" maintained by Eduardo Penaloza[-Romero], which provides Eduardo Penaloza[-Romero], and other associates of the Penaloza DTO, the appearance of legitimacy.  As documented and described above, I believe that Auto Laser has been, and will continue to be, used to receive, transfer, store or otherwise conceal both controlled substances as well as the proceeds from the distribution of controlled substances on behalf of the Penaloza DTO.

Id.,¶¶ 37, 38.

On September 8, 2014, law enforcement intercepted a call between Penaloza-Romero and Izazago-Pascacio.  Id., ¶ 40.  In this call, Penaloza-Romero and Izazaga-Pascacio discussed the availability of methamphetamine, cocaine and marijuana, in

coded language.  Id., ¶¶ 41-43.  Penaloza-Romero indicated that he had customers in New York and Florida who were waiting for marijuana.  Id., ¶ 43.  Izazaga-Pascacio told Penaloza-Romero that he had 800 pounds of marijuana available and Penaloza-Romero stated that he had a buddy who could pick up the marijuana.  Id.  During subsequent calls, Penaloza-Romero discussed with other Penaloza DTO members his intention to travel from California to Minnesota to acquire the marijuana referenced in his September 8, 2014 call with Izazaga-Pascacio.  Id., ¶ 44.  Special Agent Hamblen stated that it was his belief that on acquiring the marijuana, Penaloza-Romero would likely store it at the business and at other unknown locations in Minnesota.  Id.  Additionally, Special Agent Hamblen believed that Penaloza-Romero would maintain records related to the distribution of the marijuana at his residence.  Id.

According to Special Agent Hamblen, it is common for drug traffickers to maintain in their residences or secondary residences the items Special Agent Hamblen listed in Attachment B to the September 23, 2014 warrant applications.  Id., ¶ 4.  These items included electronic devices and documents related to the transportation, purchase and distribution of controlled substances, documents, evidence pertaining to drug proceeds, such as cash and bank statements, photographs, addresses and any indicia of ownership of the residence.  Id., Attachment B.  Further, Special Agent Hamblen stated that he was familiar with typical distribution and trafficking methods used by drug dealers and traffickers and the methods the dealers employed to conceal the controlled substances and illegal proceeds.  Id., ¶ 4.

Regarding the financial documents the Government sought to seize, Special Agent Hamblen stated that unexplained wealth was probative evidence of trafficking in

controlled substances, and therefore, financial documents can show evidence of narcotics trafficking.  Id., ¶ 5(a).  Using these financial documents, law enforcement can analyze the money spent by a suspected narcotics trafficker and subtract any legitimate income to approximate earnings from narcotics trafficking.  Id.  Special Agent Hamblen also attested that individuals and businesses maintain financial documents for an extended period of time, often years, and the records are often kept at their residences or businesses.  Id.

Additionally, because drug dealers often front (sell on consignment) controlled substances or are fronted controlled substances, records of these transactions are maintained nearby so the dealers can readily ascertain current balances.  Id., ¶ 5(b).  Special Agent Hamblen further stated that individuals attempting to conceal their assets and other individuals receiving income from illegal sources secrete currency and monetary instruments in safe deposit boxes, and the keys and rental agreements for the boxes are often maintained in a secure locate at their residences or businesses.  Id., ¶ 5(c).

Special Agent Hamblen noted that in previous searches in which he had been involved, the items sought by the warrants had been recovered in the subject's residence, business, or both.  Id., ¶ 6(a)-(d).  Special Agent Hamblen further indicated that his experience with warrants for the types of documents the Government sought confirmed that those involved in illegal activities or those laundering money from illegal activities often possessed the documents for years, even when the underlying illegal activity or financial transaction was completed earlier.  Id., ¶ 7.

The business was searched on September 24, 2014 and agents seized two cell

phones, financial records, $400 in United States currency, and two computers from the business. Gov't Ex. 7, p. 1072 (return). The residence was searched on September 24, 2014, and agents seized eight cell phones, two tablet computers, a disposable camera, two laptop computers, documents related to indicia of residency, financial records, and receipts. Gov't Ex. 8, p. 926 (return).[6]

### 2. September 24, 2014 Warrants

The Government obtained two additional search warrants on September 24, 2014, to search the residence and business for drugs, firearms and packaging materials for drugs and drug proceeds. Gov't Exs. 9, 10.[7] Special Agent Hamblen's affidavit accompanying the application for a warrant to re-search the residence stated that on the first search, law enforcement located a semiautomatic pistol with two magazines and thirty-six 9mm bullets in the master bedroom closet, a substance that tested positive for methamphetamine in a closet on the first floor, and a thermos with a large quantity of methamphetamine in the garage. Gov't Ex. 10, ¶ 17. Because these items were not described in the original search warrant application for the residence, the Government sought authorization to seize the items. Id. Law enforcement believed that the pistol, magazines, ammunition and methamphetamine constituted evidence or contraband related to the Penaloza DTO conspiracy. Id. The warrant return stated that the pistol, three magazines and thirty-six 9mm bullets were seized along with two drug scales with suspected drug residue, a cooler containing suspected methamphetamine and a

---

[6]  Throughout this Report and Recommendation, when appropriate, the Court refers to the last three digits of the Bates numbers assigned to the documents.

[7]  The return indicated that nothing was seized from the business on the second search. Gov't Ex. 10, p. 1033. As a result, there is no evidence from this search to suppress.

cooking pot with suspected methamphetamine.  Id., p. 899.

### 3.     Search Warrants of Electronic Devices

After  Penaloza-Romero  had  been  indicted,  on  October  10,  2014,  the
Government obtained a warrant to conduct a forensic examination of electronic devices,
including cell phones and computers, seized from the residence and business, among
other locations.  Gov't Ex. 11, pp. 495-96.  The application sought records relating to
customer lists, call history, saved contact information, photos related to drug trafficking,
texts, electronic correspondence related to trafficking, types and amounts of drugs,
information related to the sources of drugs, information referring to travel between
August 1, 2011 and the present, financial records, evidence regarding who owned the
device at the time the information sought was created, edited or deleted.  Id., pp. 499-
500.

The  application was supported by an affidavit from Special Agent Hamblen in
which he stated that the devices to be searched all related to, and were seized from
various  indicted  defendants,  including  Penaloza-Romero,  pursuant  to  the  search
warrants  issued by Magistrate Judge Jeffrey Keyes[8] on September 23, 2014 for
searches of the residence and business, among other locations.  Id., ¶ 9.  In support of
his request to examine these cell phones, Special Agent Hamblen stated:

> Based on training, experience, and the facts of this case, I
> believe that persons involved in drug trafficking routinely use
> their cell phones in furtherance of their drug trafficking
> activities.   For example, traffickers often use their cell
> phones to make voice calls and send text messages to
> communicate about prices, quantities and availability of

---

[8]     Magistrate Judge Keyes signed all of the warrants except the initial warrant for
forensic searches of the seized electronic devices, which was signed by Magistrate
Judge Steven Rau.

> controlled substances; as well as using their cell phones for other communication which facilitates their trafficking activities.  It has been my experience, that traffickers use laptop computers, PDA's, portable storage devices, digital cameras, portable media devices and similar devices in order to communicate, and store/transmit data or other evidence in furtherance of their trafficking activities, much the same as with their cell phones.

Id.,¶ 12.

On October 31, 2014, the Government obtained another warrant to search three laptops and a computer seized from the residence, among other devices.  Gov't Ex. 12, Attachment A, p. 2. This warrant was necessary because the Government required additional time to analyze the large number of electronic devices previously seized.  Id., ¶ 14.

## B.  Discussion

Penaloza-Romero attacked the sufficiency of the affidavits supporting the searches[9] of the residence, arguing that the applications contained almost no averments regarding the residence.  Defendant's Supplemental Memorandum in Support of Motion ("Def.'s Suppl. Mem."), pp. 1-2 [Docket No. 221].  According to Penaloza-Romero, despite of the fact that the investigation was on-going for almost three years, the most the Government could say was that it was common for drug traffickers to keep the items listed in the warrant application in their residences and that law enforcement observed the activities at the residence on July 1, 2014.  Id., p. 2. Penaloza-Romero contended that this is the only information that provided a nexus

---

[9]     Penaloza-Romero referred to the "search" of the residence in the singular, although there were two searches of the residence.  The Court assumed that he was moving to suppress evidence seized during both searches.  Furthermore, Penaloza-Romero never identified the warrants to which the objected, so the Court has assumed that he objected to both warrants.  See Gov't Exs. 8, 9.

between the Pleasant View Drive residence and drug activity.  Id.  Penaloza-Romero also stated that the surveillance of July 1, 2014, was almost two-and-a-half months before the Government applied for the warrant.  Penaloza-Romero made no legal argument in connection with this latter observation.  The Court construed this observation as an argument regarding lack of probable cause based on the staleness of the information in the affidavits.

As to the searches of the business and devices seized from the business and residence, Penaloza-Romero objected generally that there was insufficient probable cause "as well as the nexus requirement as to his residence."  Penaloza-Romero made no legal argument in connection with these statements and sought a "four corners" analysis as to the constitutionality of the searches.  Id., pp. 3-4.

The Government responded that every search warrant application was supported by probable cause—a determination made under the totality of the circumstances. Government's Supplemental Response to Defendant's Supplemental Memorandum ("Gov't Suppl. Resp."), pp. 3-4 [Docket No. 238].[10]  Additionally, judges are allowed to draw reasonable inferences from the totality of the circumstances in deciding whether an application is supported by probable cause.  Id., p. 4 (citing United States v. Thompson, 210 F.3d 855, 860 (8th Cir. 2000)).  According to the Government, the affidavits provided "overwhelming evidence" that the residence and business were likely to contain evidence of Penaloza-Romero's drug trafficking and money laundering crimes.  Id.  The affidavits described the history of the surveillance of the business and

---

[10]     The Government also incorporated by reference the arguments it had made in response to Penaloza-Romero's initial motion.  Gov't Suppl. Resp., p. 1, n. 1 (citing Docket No. 192).

residence, controlled purchases and drug seizures, all of which indicated that law enforcement knew that Penaloza-Romero was involved in criminal activity.  Id.  These facts, combined with Special Agent Hamblen's experience with criminal drug activity, supplied the requisite probable cause.  Id.  The Government contended that it was reasonable for the issuing Magistrate Judges to find that the Government had established the required nexus in light of the information the agent supplied in his affidavits.  Id., p. 6.

The Government acknowledged that "it is well-understood that 'there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue . . . .'"  Id., p. 5 (quoting United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000)).  While an informant's statements that a suspect had drugs "in his possession or at his residence" can establish the required nexus, so can a common sense inference between the place to be searched and the contraband.  Id. (citing United States v. Allen, 297 F.3d 790, 793 (8th Cir. 2002); United States v. Carpenter, 341 F.3d 666, 671-72 (8th Cir. 2003)).

The Government also acknowledged that delay may make probable cause stale, but submitted that there is no bright-line test for determining when information is stale.  Id., pp. 6-7 (citing United States v. Maxim, 55 F.3d 394, 397 (8th Cir. 1995)).  The passage of time alone does not determine the staleness of probable cause.  Id. (citing United States v. Jeanetta, 533 F.3d 651, 655 (8th Cir. 2008)).  The Government contended that Penaloza-Romero's staleness argument was meritless for two reasons.  Id., p. 7.  First, Special Agent Hamblen's affidavits were replete with information regarding the drug conspiracy, which operated over many years.  Id.  This information

supported the need to search both the residence and the business.  Id.  Second, the search warrant affidavits dated September 23 and 24, 2014, reflected information as recent as September 8, 2014, regarding a discussion between Penaloza-Romero and Izazaga-Pascacio in which they discussed an 800-pound marijuana transaction.  Id. (citing Gov't Ex. 7, p. 17).[11]

Lastly, the Government maintained that if the warrant applications were found wanting, the Court should apply the "good faith" exception of United States v. Leon, 468 U.S. 897 (1984).  Id., p. 11.

For the following reasons, the Court recommends denying Penaloza-Romero's motion to suppress the searches of his residence, business and electronic devices.

When a search is executed pursuant to a warrant, a court must determine whether the warrant is supported by probable cause.  United States v. Proell, 485 F.3d 427, 430 (8th Cir. 2007) (citing Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998)). Probable cause exists "if there is a fair probability that contraband or evidence of a crime will be found in the place to be searched."  United States v. Paton, 535 F.3d 829, 836 (8th Cir. 2008) (quoting Thompson, 210 F.3d at 860).  In other words, "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue."  Tellez, 217 F.3d at 550 (citing United States v. Koelling. 992 F.2d 817, 823 (8th Cir. 1993)).  On the other hand, "[p]robable cause does not require direct evidence linking a crime to a particular place."  United States v. Anderson, 450 F.3d 294, 303 (7th Cir. 2006) (citation omitted).  "[M]agistrates are 'entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of

---

[11]    This affidavit was submitted in support of the search of the business.  The same affidavit was submitted in support of the search of the residence.  Gov't Ex. 8.

the evidence and the type of offense . . . .'" United States v. Caswell, 436 F.3d 894, 899 (8th Cir. 2006) (citations omitted).  Accordingly, the task of a judge issuing a search warrant is "simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983).  "Probable cause is a 'fluid concept;' therefore, magistrates should read affidavits with common sense and 'not in a grudging, hyper technical fashion.'" Caswell, 436 F.3d at 897 (quoting Walden, 156 F.3d at 870).

When reviewing the decision of the issuing judge, a district court must ensure that the magistrate had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 238-39 (citation omitted); see also United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as the reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed . . . .").  In doing so, a court must give "great deference to the magistrate's probable cause determination." Caswell, 436 F.3d at 897 (citing United States v. Arenal, 768 F.2d 263, 266 (8th Cir.1985)); LaMorie, 100 F.3d at 552 ("[W]e owe substantial deference to the determination of probable cause by the issuing judge."). At the same time, the Eighth Circuit has warned that "[c]onclusory statements made by affiants fail to give the issuing magistrate a substantial basis for determining that probable cause exists." United States v. Summage, 481 F.3d 1075, 1077-78 (8th Cir. 2007) (quoting Caswell, 436 F.3d at 897-98).  "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action

cannot be a mere ratification of the bare conclusions of others." Id. (quoting Gates, 462 U.S. at 239).  "When the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." United States v. O'Dell, 766 F.3d 870, 874 (8th Cir. 2014) (alteration in original) (quoting United States v. Soloman, 432 F.3d 824, 827 (8th Cir.2005)).

The Court finds that Special Agent Hamblen's affidavits accompanying the applications for the September 23, 2014 search warrants provided probable cause to search the residence and business.  The affidavits set forth in great detail the evidence garnered over the course of a long investigation, which led the Government to conclude that Penaloza-Romero was engaged in drug trafficking and that it was highly likely that the items described in Attachment B to the affidavits would be located at his residence and business.  Govt's Ex. 8, ¶¶ 8, 9, 23-38, 39-45.

Special Agent Hamblen described activities at the residence on July 1, 2014, including Imer Penaloza and Izazaga-Pascacio exiting the residence carrying envelopes and later counting money, which Special Agent Hamblen believed was contained in the envelopes, and the transfer of the cardboard box from Imer Penaloza's BMW to Arnaldo Almendarez—a box that was later found to contain bundles of marijuana.  Id., ¶ 40. This information, which indicated that there was criminal activity afoot at the residence, was corroborated by the telephone conversation intercepted on September 8, 2014, between Penaloza-Romero and Izazaga-Pascio just shortly before Penaloza-Romero was indicted.  Id., ¶¶ 41-44.  This call showed the defendants discussing the availability of marijuana for customers in New York and Florida, Izazaga-Pascacio's possession of

800 pounds of marijuana, and Penaloza-Romero's ability to arrange to have the marijuana picked up by an associate.  Id., ¶ 43.  Based on his extensive experience, Special Agent Hamblen believed that Penaloza-Romero would maintain records relating to the distribution of "this marijuana" at his residence, thus linking the residence to criminal activity.  Id., ¶ 44.  Indeed, "[a]s a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence."  Carpenter, 341 F.3d at 671.

Any suggestion by Penaloza-Romero that the search of his residence was stale is rejected.  "The facts in an affidavit supporting a search warrant must be sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search and not simply as of some time in the past."  United States v. Palega, 556 F.3d 709, 715 (8th Cir. 2009) (citation omitted).  There is no fixed rule for determining when information has become stale.  Koelling, 992 F.2d at 822.  "The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation."  United States v. Smith, 266 F.3d 902, 904-905 (8th Cir. 2001).  "In investigations of ongoing narcotic operations, 'intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale.'"  United States v. Formaro, 152 F.3d 768, 771 (8th Cir.1998) (citation omitted).  Here, where the activities of the Penaloza DTO had been going on for several years, and had implicated the residence on more than one occasion and as recent as September 8, 2014, the Court concludes that information was not stale "when taken as a whole."  Palega, 556 F.3d at 715.

The follow-up warrant of the residence issued on September 24, 2014, merely authorized the seizure of items observed during the first search of the residence and was supported by Special Agent Hamblen's statement that controlled substances and firearms have typically constitute drug-related evidence that has been seized from the residence or place of business of the subject. Gov't Ex. 9, ¶ 6(a)-(b).

As to the September 24, 2014 search of the business, Special Agent Hamblen described the ongoing surveillance efforts at the business over the previous year-and–a-half; and the repeated observations by law enforcement indicating that the business was being used to further the Penaloza DTO, including the intercepted call on June 26, 2014, in which Imer Penaloza and Izazaga-Pascacio negotiated the sale of two pounds of methamphetamine, which was later delivered to the business, (id., ¶¶ 24, 25, 28-32), and Penaloza-Romero's text on August 3, 2017, directing Rito at the business to deliver a non-specified amount of methamphetamine, id., ¶ 35. The Court concludes that the application showed more than a "'fair probability that law enforcement officers would discover further evidence of illegal drug activity'" at the business. United States v. Garcia-Hernandez, 682 F.3d 767, 771 (8th Cir. 2012) (quoting United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2012).

Special Agent Hamblen's affidavits in support of the forensic searches of the electronic devices are similarly detailed and presented adequate support regarding the likelihood of finding evidence of drug trafficking and money laundering on the devices. It is important to note that these applications were made after Penaloza-Romero was indicted, a fact referenced by Hamblen to establish probable cause. See Gov't Ex. 11, ¶ 8, Gov't Ex. 12, ¶ 8. In addition to Special Agent Hamblen's informed opinion

regarding evidence that may be stored on the devices, common sense dictates that an individual indicted on drug charges has likely been communicating via electronic devices in furtherance of his crimes, and not, for example, by the United States mail. See United States v. Vore, 743 F.3d 1175, 1179 (8th Cir. 2014) ("In making the probable cause determination we apply a common sense approach and consider all relevant circumstances.") (citation omitted).  Therefore, the Court recommends that the evidence seized pursuant to the October 10, 2014 warrant not be suppressed.

For all of these reasons, the Court recommends that the evidence seized pursuant to the warrants should not be suppressed.[12]

---

[12]   Because the search warrants were supported by probable cause, this Court need not determine whether the Leon good-faith exception should apply.  The Court notes, however, that even if the warrants lacked probable cause, law enforcement's reliance on the warrants would have been reasonable under Leon.

> Under the [Leon] good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable. The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization.

United States v. Perry, 531 F.3d 662, 665 (8th Cir. 2008) (citing Proell, 485 F.3d at 430-31 (alterations in original) (internal quotations omitted).

In Leon, the Supreme Court explained that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'" 468 U.S. at 922 (citations omitted).  However, the Court noted that there are certain instances when "the purpose of the exclusionary rule—deterring police misconduct—will not be served by suppressing illegally seized evidence." United States v. Martin, 833 F.2d 752, 755 (8th Cir. 1987); Leon, 468 U.S. at 922-23.

> Leon identified four situations in which an officer's reliance on a warrant would be unreasonable: (1) when the affidavit or

## III.   TARGET TELEPHONE #4 AND #5

Penaloza-Romero sought to suppress the content of intercepted communications from the wiretap of Target Telephone #4 and #5 on the ground that the Government failed to show that other methods of obtaining the results of the search had previously been exhausted, as required under the Federal Wiretap Act, 18 U.S.C. § 2518(1)(c). Def.'s Mot., pp. 1-2; Def.'s Suppl. Mem., pp. 2-3.   Penaloza-Romero contended that the Government's affidavits in support of the search warrants provided no detail as to why previous investigative techniques failed to provide the information sought, what techniques were unlikely to succeed if tried, and what techniques would have been too

---

testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

Perry, 531 F.3d at 665 (quoting Proell, 485 F.3d at 431).   With respect to the third exception, the Eighth Circuit explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in Leon or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words." Proell, 485 F.3d at 432 (quoting Carpenter, 341 F.3d at 670).

In this case, Penaloza-Romero has not alleged—and the Court does not find— that the affidavit contained a false statement, or that the Magistrate Judges wholly abandoned their judicial roles in issuing the search warrants.  As to the third and fourth exceptions, as set forth above, the affidavits provided substantial information concerning the   investigation and sources of information, not merely conclusory allegations of criminal conduct, and tied the facts alleged to the residence, business and electronic devices.  Therefore, based on all the facts and circumstances of this case, it was not "entirely unreasonable" for law enforcement to rely on the Magistrate Judges' issuance of the search warrants.

dangerous to attempt.[13]  Id., p. 3.  The Government responded that the supporting affidavits clearly demonstrated the need to intercept communications from the Target Telephones.  Gov't Suppl. Resp., p. 8.  The Government submitted that each affidavit "specifically outlined law enforcement's objectives, investigative methods used to date, and the progress (or lack thereof) in achieving those goals."  Id.

### A.   Factual Background

On July 24, 2014, the Government submitted an Application for the Interception of Wire and Electronic Communications for Target Telephone #4.  Gov't Ex. 4. According to the Government, Target Telephone #4 was known to be used by Penaloza-Romero in furtherance of drug trafficking activity.  Id., pp. 2-6.  The application included an affidavit in support of the application ("TT-4 Aff."), which was prepared by Special Agent Hamblen with Homeland Security Investigations.  Gov't Ex. 4, pp. 20-114.

On August 15, 2014, the Government filed an Application for the Interception of Wire and Electronic Communications for Target Telephone #5.  Gov't Ex. 5.  The Government alleged that Penaloza-Romero was using Target Telephone #5 in connection with the commission of drug trafficking offenses.  Id., pp. 2-6.  As part of the application, Special Agent Hamblen submitted a supporting affidavit ("TT-5 Aff.").  Gov't Ex. 5, pp. 30-145.

In both affidavits, Special Agent Hamblen attested that the interception of wire communications over Target Telephone #4 ("TT-4") and Target Telephone #5 ("TT-5") was necessary to obtain information in furtherance of the goals and objectives of the

---

[13]   Penaloza-Romero did not allege that the applications for the wire taps of Target Telephones #4 and #5 lacked probable cause, or that the minimization requirements of Chapter 119 of Title 18 of the United States Code had not been followed.

investigation, including: (1) the full scope, methods, extent, and personnel involved in the Penaloza DTO; (2) the identity and role of members of the Penaloza DTO, including the suppliers, sellers, buyers, couriers, financiers, and other co-conspirators; (3) the period and methods of operation of the Penaloza DTO; (4) the management, disposition, and money laundering of revenues and proceeds obtained by the Penaloza DTO; (5) the identity of assets held under fictitious names; (6) the identity and role of any suppliers of firearms to the members of the Penaloza DTO; and (7) to obtain admissible evidence which would demonstrate beyond a reasonable doubt that Penaloza-Romero and other target interceptees committed the alleged violations of law set forth in the Superseding Indictment.  TT-4 Aff., ¶ 140; TT-5 Aff., ¶ 172.

Special Agent Hamblen indicated that conventional methods used to investigate drug conspiracies (e.g., physical surveillance, record checks, informant interviews, pen registers, GPS tracking, analysis of toll records, and trash seizures), had not provided sufficiently specific information as to the conduct, participation, and scope of the conspiracy to obtain criminal convictions of all co-conspirators and their suppliers.  TT-4 Aff., ¶ 142; TT-5 Aff., ¶ 174.  Special Agent Hamblen further stated that the techniques used in the current investigation had not enabled law enforcement officers to identify all the members of the conspiracy and all the places and networks used to store and distribute controlled substances.  Id.

On July 24, 2014, United States District Judge Susan Richard Nelson issued an order authorizing the interception of wire communications from TT-4 for a period of 30 days.  Govt. Ex. 4, pp. 115-125.  Judge Nelson found that there was probable cause to believe that the targets of the interception have been and continue to commit narcotic

trafficking crimes and that the interception of communications from TT–4 will concern communications dealing with the commission of narcotics crimes. Id., pp. 146-148. The Court also found that normal investigative procedures had been tried without success and reasonably appeared unlikely to succeed if tried, or were too dangerous to employ. Id., p. 148.

On August 15, 2014, Senior United States District Judge Paul A. Magnuson authorized the interception of wire communications from TT-5 for a period of 30 days, having made similar findings regarding the existence of probable cause and the exhaustion of traditional investigative techniques by law enforcement officers. Gov't Ex. 5, pp. 146-156.

Both Judges Nelson and Magnuson were provided the following information in support of the applications.

### 1.    Previous Wire Interceptions

Special Agent Hamblen indicated that the previously authorized wiretap of telephones used by co-defendant Jose Felix Ruiz-Valencia could not yield additional evidence because Ruiz-Valencia was indicted on June 19, 2014. TT-4 Aff., ¶ 143; TT-5 Aff., ¶ 175. Special Agent Hamblen stated that the authorized interception of Target Telephone #1 ("TT-1"), previously used by co-defendant Imer Penaloza, could not be employed because the handset for TT-1 had been and remained turned off. TT-4 Aff., ¶ 144; TT-5 Aff., ¶ 176. Special Agent Hamblen stated that Target Telephone #2 ("TT-2"), used by Imer Penaloza, ran out of credit with the service provider and had not been renewed. TT-4 Aff., ¶ 145; TT-5 Aff., ¶ 177. As to Target Telephone #3 ("TT-3"), used by co-defendant Izazaga-Pascacio, Special Agent Hamblen attested in the TT-4

24

Affidavit that Izazaga-Pascacio planned to leave the United States on or about July 26, 2014, and, therefore, law enforcement did not anticipate any pertinent calls to be intercepted after that date.   TT-4 Aff., ¶ 146.   In the TT-5 Affidavit, Special Agent Hamblen confirmed that Izazaga-Pascacio left the United States on July 26, 2014, and no relevant phone calls were intercepted from TT-3 subsequent to his departure.   TT-5 Aff., ¶ 178.   In addition, Izazaga-Pascacio did not possess TT-3 or any other phone upon his return to the United States.   Id.   In the TT-5 Affidavit, Special Agent Hamblen also reported that the wiretap for TT-4, registered to Penaloza-Romero, was unsuccessful because Penaloza-Romero had stopped using TT-4 on August 7, 2014. Id., ¶ 179.   Special Agent Hamblen concluded that the interception of communications over TT-2, TT-3, and TT-4 did not provide definitive information as to the ultimate or direct source of supply to Penaloza-Romero and others involved with the Penaloza DTO.  TT-4 Aff., ¶¶ 148, 149; TT-5 Aff., ¶¶ 181, 182.

## 2.     Confidential Sources

With regard to confidential informants, Special Agent Hamblen identified nine informants that had been consulted during the course of the investigation.   Special Agent Hamblen stated that CI-1 had been able to obtain large quantities of methamphetamine from Penaloza-Romero but could not identify or obtain information as to the location in which the narcotics are stored, the means by which the Penaloza DTO laundered its proceeds, the roles of the conspirators within the organization, or the sources of the narcotics.   TT-4 Aff., ¶¶ 152, 153; TT-5 Aff., ¶¶ 185, 186.   Special Agent Hamblen believed that Penaloza-Romero and others within the Penaloza DTO knew the names and whereabouts of CI-1's immediate family.   TT-4 Aff., ¶ 154; TT-5 Aff., ¶ 187.

Special Agent Hamblen also reported that on July 16, 2014, CI-1 was forced to abandon a controlled purchase from Penaloza-Romero after law enforcement officers determined that doing so would endanger the safety of CI-1.  TT-4 Aff., ¶ 155; TT-5 Aff., ¶ 188.  In the TT-5 Affidavit, Special Agent Hamblen indicated that on August 7, 2014, CI-1 learned that Penaloza-Romero was using TT-5 in furtherance of his narcotics trafficking campaign.  TT-5 Aff., ¶ 189.  Special Agent Hamblen further noted that law enforcement could not afford to continuously pay tens of thousands of dollars to the Penaloza DTO for controlled purchases.  TT-4 Aff., ¶ 154; TT-5 Aff., ¶ 187.  For those reasons, Special Agent Hamblen concluded that law enforcement could no longer rely on CI-1 as a source of information on the Penaloza DTO.  TT-4 Aff., ¶ 154; TT-5 Aff., ¶ 187.

With respect to other confidential informants, Special Agent Hamblen attested that CI-2 has familial ties to the Penaloza family and has occasionally provided information as to co-defendant Izazaga-Pascacio.  TT-4 Aff., ¶ 156; TT-5 Aff., ¶ 190. However, Special Agent Hamblen noted that the Penaloza DTO knows that CI-2 is not involved in drug trafficking, and, therefore, any information received from CI-2 is not within the control law enforcement.  Id.

Special Agent Hamblen attested that cooperating co-defendant Alfredo Briones-Cuate had previously provided information as to Penaloza-Romero and the Penaloza DTO.  TT-4 Aff., ¶ 157; TT-5 Aff., ¶ 191.  However, Special Agent Hamblen noted that Briones-Cuate's arrest was known to the Penaloza DTO, and, therefore, Briones-Cuate could no longer provide information to law enforcement.  Id.

As to CI-3, Special Agent Hamblen stated that in February of 2014, law enforcement agents learned that CI-3 was involved in unauthorized illegal activity;

consequently, CI-3's status as an informant was terminated. TT-4 Aff., ¶ 158; TT-5 Aff., ¶ 192.

Special Agent Hamblen indicated that DEA-CS had a history of providing reliable information, but he did not have direct contact with Penaloza-Romero or the Penaloza DTO. TT-4 Aff., ¶ 159; TT-5 Aff., ¶ 193. Therefore, Special Agent Hamblen believed that DEA-CS could receive only incidental information about Penaloza-Romero. Id.

Special Agent Hamblen attested that BCA-CI was a former associate of Penaloza-Romero but is no longer in contact with law enforcement, and, therefore, unable to provide assistance to this investigation. TT-4 Aff., ¶ 160; TT-5 Aff., ¶ 194.

Special Agent Hamblen reported that MPD-CI was directed by law enforcement to gain employment through Penaloza-Romero but had been unable to do so. TT-4 Aff., ¶ 161; TT-5 Aff., ¶ 195.

Special Agent Hamblen stated that SPPD-CI had been successful in introducing undercover agents to Penaloza-Romero. TT-4 Aff., ¶ 162; TT-5 Aff., ¶ 196. However, in May of 2014, SPPD-CI left the United States and was no longer in contact with law enforcement. Id.

Special Agent Hamblen reported that FBI-CI had been a reliable source of information as to persons associated with the Penaloza DTO, but he did not have any information that had not already been provided to law enforcement. TT-4 Aff., ¶ 163; TT-5 Aff., ¶ 197.

Lastly, Special Agent Hamblen explained that while the use of confidential informants has continued to corroborate and verify that the Penaloza DTO members are supplied drugs by Penaloza-Romero and others, the information always fell short of the

evidence sought by the investigation, and, in his opinion, the development of new confidential informants would not, in and of itself, meet the goals of this investigation. TT-4 Aff., ¶ 164; TT-5 Aff., ¶ 198.

### 3. Controlled Purchases

Special Agent Hamblen attested that, between September 10, 2012 and June 12, 2014, law enforcement officers conducted nine controlled purchases of narcotics from members of the Penaloza DTO. TT-4 Aff., ¶ 165; TT-5 Aff., ¶ 199. On July 31, 2014, CI-1 attempted to purchase one pound of methamphetamine from Penaloza-Romero. TT-5 Aff., ¶ 200. Law enforcement eventually learned that Penaloza-Romero was not in possession of methamphetamine at the time of the request and could not acquire methamphetamine from an alternative source in a timely manner. Id. Penaloza-Romero told CI-1 that a new shipment of methamphetamine was scheduled to arrive in Minnesota, but law enforcement seized the drugs on August 5, 2014. Id. Special Agent Hamblen explained that while controlled purchases had corroborated information received from confidential informants, the controlled purchases themselves had not produced information necessary to identify stash locations, the roles of various members of the Penaloza DTO, and the methods used to launder the proceeds of illegal activity. TT-4 Aff., ¶ 166; TT-5 Aff., ¶ 201. Consequently, Special Agent Hamblen did not believe that making additional controlled purchases would result in meeting the goals of his investigation. Id.

### 4. Physical Surveillance

Special Agent Hamblen indicated that since 2011, law enforcement from approximately a dozen different law enforcement agencies had assisted Homeland

Security Investigations with surveillance of the targets of the investigation of the Penaloza DTO, and had spent thousands of hours conducting physical and electronic surveillance.  TT-4 Aff., ¶ 169; TT-5 Aff., ¶ 204.  Nevertheless, physical surveillance, by itself, rarely produced sufficient evidence of criminal activities under investigation and often left investigators without information as to the purpose of meetings or other activity.  TT-4 Aff., ¶ 167; TT-5 Aff., ¶ 202.  According to Special Agent Hamblen, subjects of investigation are extremely cautious and employ counter-surveillance techniques, such as alerting each other to the presence of any law enforcement in their area.  TT-4 Aff., ¶ 170; TT-5 Aff., ¶ 205.  Special Agent Hamblen explained that court-authorized interception of wire communications would allow investigators to discern the purpose of meetings, which could constitute strong evidence of criminal activity.  TT-4 Aff., ¶ 168; TT-5 Aff., ¶ 203.

By way of example, Special Agent Hamblen reported that on February 8, 2014, Penaloza-Romero told CI-1 that law enforcement agents had been following him the previous day and warned CI-1 to stay away from his business Auto Laser.  TT-4 Aff., ¶ 171; TT-5 Aff., ¶ 206.   In fact, law enforcement agents had been conducting surveillance of Izazaga, Penaloza-Romero and Auto Laser, but the surveillance was short-lived because as soon as law enforcement began the surveillance, Izazaga-Pascacio began using counter-surveillance driving techniques.  Id.  Further, as a result of this surveillance, Penaloza-Romero discarded the phone he used to contact CI-1, acquired a new phone, and told CI-1 that he did so to avoid law enforcement gathering evidence against him and to avoid detection.  Id.

Special Agent Hamblen gave other examples where law enforcement's efforts to conduct physical surveillance of the activities of the Penaloza DTO had been stymied. On April 27, 2014, law enforcement agents attempted to follow Imer Penaloza in his vehicle.  TT-4 Aff., ¶ 172; TT-5 Aff., ¶ 207.  Agents were only able to follow Penaloza for five minutes before he employed counter-surveillance techniques, such as driving in circuitous patterns and making unnecessary turns.  Id.  Agents were unable to continue their surveillance without being detected and, therefore, had to discontinue following. Id.

On May 6, 2014, law enforcement agents employed a mobile tracking device on a vehicle driven by Imer Penaloza.  TT-4 Aff., ¶ 173; TT-5 Aff., ¶ 208.  According to Special Agent Hamblen, the tracking device confirmed that Imer Penaloza consistently employed counter-surveillance measures, which made physical surveillance unreasonably difficult.  Id.

Special Agent Hamblen indicated that law enforcement agents used "extraordinary measures" to avoid detection by Izazaga-Pascacio, Imer Penaloza, and Penaloza-Romero.  TT-4 Aff., ¶ 174; TT-5 Aff., ¶ 209.  These measures included using a dozen different vehicles during surveillance operations, as well as tracking devices and pole cameras.  Id.  In response to these measures, Penaloza-Romero changed vehicles and license plates.  Id.  Penaloza-Romero and others associated with the Penaloza DTO also identified many undercover law enforcement vehicles and gave the descriptions of these vehicles and their license plate numbers to other members of the Penaloza DTO.  TT-4 Aff., ¶ 176; TT-5 Aff., ¶ 211.  Further, officers witnessed members

of the Penaloza DTO using counter-surveillance techniques on its customers.  TT-4 Aff.,
¶ 177; TT-5 Aff., ¶ 212.

Special Agent Hamblen described how the interception of calls on TT-2 and TT-3 during physical surveillance in June, July and August of 2014, assisted law enforcement officers in identifying persons who have been visually encountered but unidentified.  TT-4 Aff., ¶¶ 178-185; TT-5 Aff., ¶¶ 213-223.  He also noted that the interception of calls helped identify several previously unknown locations used by the Penaloza DTO.  Id.  Special Agent Hamblen attested that law enforcement officers would continue to conduct physical surveillance of the Penaloza DTO and that, in his opinion, continued surveillance combined with the interception of communications would help investigators positively identify additional associates of the Penaloza DTO.  TT-4 Aff., ¶ 186; TT-5 Aff., ¶ 224.

### 5.    Undercover Agents

With respect to the use of undercover agents, Special Agent Hamblen attested that on March 11, 2014, police had attempted to introduce undercover agents to Penaloza-Romero through CI-1.  TT-4 Aff., ¶ 187; TT-5 Aff., ¶ 225.  Penaloza-Romero initially agreed to meet the agents, but he changed his mind at the last minute and told CI-1 that he would not meet or deal with the agents directly.  Id.  Special Agent Hamblen explained that law enforcement had hoped to use undercover agents to obtain information and evidence against the Penaloza DTO, but he concluded that the use of undercover agents will not be possible with respect to Penaloza-Romero under the current investigation.  TT-4 Aff., ¶ 188; TT-5 Aff., ¶ 226.

For example, Special Agent Hamblen indicated that law enforcement successfully introduced an undercover agent ("SPPD-UC") to Imer Penaloza on April 24, 2014.  TT-4 Aff., ¶ 189; TT-5 Aff., ¶ 227.  SPPD-UC was able to make payment for a drug debt, conduct a controlled purchase of methamphetamine, and confirm Imer Penaloza's usage of TT-1 and TT-2.  Id.  Special Agent Hamblen noted, however, that it did not appear that SPPD-UC would be brought deeper into the Penaloza DTO as a trusted party because Imer Penaloza believed SPPD-UC was merely a low-level narcotics dealer who "'lives two hours away.'"  Id.  Therefore, Special Agent Hamblen concluded that the further use of SPPD-UC would not further the ultimate goals of the investigation.  Id.  Additionally, Special Agent Hamblen believed that the introduction of more undercover agents would not achieve the goals of the investigation because the Penaloza DTO was largely composed of members of the Penaloza family or other persons with long-term relationships with the organization.  TT-4 Aff., ¶ 190; TT-5 Aff., ¶ 22.  As such, Special Agent Hamblen opined that only family members or well-known associates with a long history with the Penaloza DTO could gain the information sought by this investigation.  Id.

### 6.    Search Warrants

According to Special Agent Hamblen, law enforcement officers obtained and executed several search warrants during the course of the investigation.  TT-4 Aff., ¶ 191; TT-5 Aff., ¶ 229.  However, because members of the Penaloza DTO do not keep large quantities of drugs or contraband in any particular place for long, the searches have resulted in no seizures.  Id.  Law enforcement has concluded that the Penaloza

DTO often changes storage locations of its contraband and proceeds to avoid seizure by law enforcement.  Id.

For example, on February 4, 2014, law enforcement officers executed a search warrant at the residence of Agustin Penaloza in Fridley, Minnesota.  TT-4 Aff., ¶ 192; TT-5 Aff., ¶ 230.  Officers had previously observed Agustin Penaloza bringing drug proceeds to his apartment at the direction of Penaloza-Romero.  Id.  During a canine sweep of the apartment building, the canine alerted to Apartment #11.  Id.  However, by the time law enforcement officers executed the search, the contraband had been moved.  Id.

In the TT-5 Affidavit, Special Agent Hamblen stated that in August of 2014, law enforcement obtained search warrants for two cell phones seized from co-defendant Romero Espinoza on August 5, 2014.  TT-5 Aff., ¶ 231.  However, the forensic examination of these phones has not yet been completed.  Id.

Special Agent Hamblen believed that search warrants, by themselves, would not meet the goals of this investigation and that evidence seized would implicate only the individual directly associated with it, and not the entire Penaloza DTO.  TT-4 Aff., ¶ 193; TT-5 Aff., ¶ 233.  Special Agent Hamblen opined that search warrants, in order to be effective, must be coordinated with information regarding the immediate location of the sought-after evidence, which is best achieved with the interception of calls.  TT-4 Aff., ¶ 194; TT-5 Aff., ¶ 234.

### 7.    Interviews and Grand Jury Subpoenas

Special Agent Hamblen attested that during the course of investigation into the Penaloza DTO, law enforcement officers had conducted approximately fifteen

interviews with disgruntled family members, former business employees, cooperating defendants, accountants, neighbors, and other persons. TT-4 Aff., ¶ 195; TT-5 Aff., ¶ 235. These interviews revealed some information about Penaloza-Romero, but not enough to achieve the goals of the investigation. Id. Special Agent Hamblen noted that interviews with associates of the Penaloza DTO had been entirely fruitless. Id. Moreover, Special Agent Hamblen surmised that conducting interviews with the subjects of investigation would likely alert the Penaloza DTO to the Government's investigation and would cause the subjects to flee the jurisdiction. TT-4 Aff., ¶ 196; TT-5 Aff., ¶ 236.

Based on his training and experience, Special Agent Hamblen opined that grand jury subpoenas would not be effective in the investigation because, if called to testify, members of the Penaloza DTO would likely invoke their Fifth Amendment privileges. TT-4 Aff., ¶ 197; TT-5 Aff., ¶ 237. Special Agent Hamblen also believed that seeking grand jury immunity for Penaloza DTO members would not be possible, as it would likely foreclose prosecution of the most culpable persons. Id. In addition, Special Agent Hamblen believed that the individuals under investigation would likely lie under oath. Id. Special Agent Hamblen attested that he was not aware of any person who could be interviewed or subpoenaed and who would provide relevant or truthful evidence in furtherance of the investigation. TT-4 Aff., ¶ 198; TT-5 Aff., ¶ 238. In addition, the use of grand jury techniques would alert the Penaloza DTO to the existence of the investigation. Id.

8.    **Trash Searches**

Special Agent Hamblen attested that trash searches were largely impossible because most of the subjects of investigation live in apartment buildings with communal trash receptacles.  TT-4 Aff., ¶ 199; TT-5 Aff., ¶ 239.  Special Agent Hamblen indicated that Penaloza-Romero's business had trash receptacles inside the building, which was not accessible to law enforcement.  TT-4 Aff., ¶ 200; TT-5 Aff., ¶ 240.  Law enforcement officers had considered approaching the garbage service provider but were concerned that the Penaloza DTO would be alerted to the investigation.  Id.

Special Agent Hamblen stated that police conducted a trash search at Izazaga-Pascacio's residence in Fresno, California, but it did not generate any evidence.  TT-4 Aff., ¶ 201; TT-5 Aff., ¶ 241.  Law enforcement had not been able to locate Izazaga-Pascacio's residence in Minnesota due to the use of counter-surveillance techniques.  Id.

With respect to Imer Penaloza, Special Agent Hamblen attested that law enforcement had identified three different locations in Minnesota in which Imer Penaloza spent his nights, two of which were apartment buildings with communal trash receptacles.  TT-4 Aff., ¶ 202; TT-5 Aff., ¶ 242.  The third location was a single family residence, but Special Agent Hamblen noted that the family had no involvement in the Penaloza DTO, and, therefore, the contents of the residence's trash could not reasonably be attributed to Imer Penaloza.  Id.

Special Agent Hamblen added that law enforcement had conducted trash searches of other addresses frequently visited by Imer Penaloza on March 28 and April 8, 2014, which failed to produce any evidence.  TT-4 Aff., ¶ 203; TT-5 Aff., ¶ 243.

Special Agent Hamblen stated that trash searches are not effective in fully identifying the participants in a narcotics conspiracy, as narcotics trafficking is not a document-intensive crime.   TT-4 Aff., ¶ 204; TT-5 Aff., ¶ 244.   Therefore, law enforcement agents did not attempt further trash searches.   Id.

### 9.    Covert Cameras

Special Agent Hamblen attested that in December, 2012, law enforcement installed a covert camera that records the activity in the front of Penaloza-Romero's business Auto Laser.   TT-4 Aff., ¶ 205; TT-5 Aff., ¶ 245.   According to Special Agent Hamblen, this camera assisted law enforcement in identifying suspected Penaloza DTO members and their vehicles.   Id.   However, because the camera does not record sound, officers do not know the nature of the activity being recorded.   TT-4 Aff., ¶ 206; TT-5 Aff., ¶ 246.   Special Agent Hamblen added that the covert camera showed only the public area leading to the front of the business, and, therefore, any activity occurring inside the building remained hidden.   Id.

Special Agent Hamblen indicated that another pole camera was installed at a residence frequented by Imer Penaloza.   TT-4 Aff., ¶ 207; TT-5 Aff., ¶ 247.   This camera mostly served to exclude the residence as a criminally involved location associated with the Penaloza DTO and did not provide any useful evidence.   Id.

In May of 2014, law enforcement agents installed pole cameras at XXXX Harriet Avenue, Shoreview, Minnesota—a suspected stash location used by the Penaloza DTO; XXXX 83rd Avenue, Spring Lake Park, Minnesota—the suspected primary residence of Imer Penaloza; and XXXX East Acacia Avenue, Fresno, California—the known part-time residence of Izazaga-Pascacio.   TT-4 Aff., ¶ 208; TT-5 Aff., ¶ 248.

According to Special Agent Hamblen, these cameras provided law enforcement with information as to vehicles used by the Penaloza DTO, the location and travel patterns of Penaloza-Romero and co-defendants Perez-Arenas,[14] Imer Penaloza, and Izazaga-Pascacio.  TT-4 Aff., ¶ 209; TT-5 Aff., ¶ 249.  However, the cameras did not provide information as to the purpose of meetings at these locations or the intentions of persons observed on the cameras.  Id.

Special Agent Hamblen attested that on June 6, 2014, law enforcement officers saw Izazaga-Pascacio and Imer Penaloza visiting the Harriet Avenue and 83rd Avenue locations.  TT-4 Aff., ¶ 210; TT-5 Aff., ¶ 250.  The two were seen again on June 8, 2014 at Izazaga-Pascacio's residence in Fresno, California.  Id.  Although the cameras determined the location of Izazaga-Pascacio and Imer Penaloza, they provided no information as to the purpose of the trip to California.  Id.  However, on June 17, 2014, law enforcement agents intercepted a call on TT-2, during which agents learned that Izazaga-Pascacio and Imer Penaloza had travelled to California to pay off a drug debt and to make arrangements for the delivery of quantity of drugs to Minnesota.  Id.  Special Agent Hamblen indicated that the pole cameras failed to provide timely information as to the purpose of the California trip, which, if known, could have led to the identification of the ultimate source of narcotics bound for Minnesota.  TT-4 Aff., ¶ 211; TT-5 Aff., ¶ 251.

### 10.    Tracking Devices

During the course of investigation, Special Agent Hamblen concluded that use of a vehicle tracking device would not be effective in tracking Penaloza-Romero, Izazaga-

---

[14]    In his affidavits, Special Agent Hamblen referred to Perez-Arenas as "Perez." The Court uses the name provided in the Superseding Indictment.

Pascacio, or Imer Penaloza.  TT-4 Aff., ¶ 212; TT-5 Aff., ¶ 252.  Special Agent Hamblen explained that Penaloza-Romero owns an automobile sales business and frequently operates different vehicles.  Id.  Similarly, Izazaga-Pascacio is involved with buying and selling automobiles at auctions and had consistently been observed driving different vehicles.  Id.  As for phone tracking, Special Agent Hamblen indicated it had limitations. For example, Imer Penaloza often discards his phones.  TT-4 Aff., ¶ 213; TT-5 Aff., ¶ 253.

Special Agent Hamblen stated that on April 16, 2014, law enforcement received authorization to use a vehicle tracking device on a vehicle used by Imer Penaloza.  TT-4 Aff., ¶ 214; TT-5 Aff., ¶ 254.  Days later, law enforcement learned that Imer Penaloza had stopped using the vehicle.  Id.  Police surveillance confirmed that an unidentified male and female were now operating the vehicle, which was no longer going to locations frequented by the Penaloza DTO.  Id.

On April 28, 2014, the use of a vehicle tracking device was authorized on a vehicle used by Imer Penaloza.  TT-4 Aff., ¶ 215; TT-5 Aff., ¶ 255.  The authorization was renewed on May 12, 2014.  TT-4 Aff., ¶ 219; TT-5 Aff., ¶ 259 (citing 14-MJ-195 (JJK)).  Special Agent Hamblen noted that the use of this tracking device has assisted law enforcement officers in determining Imer Penaloza's travel routine and destinations. TT-4 Aff., ¶ 215; TT-5 Aff., ¶ 255.

On May 2, 2014, law enforcement obtained a court authorization for the tracking of PP4, a phone used by Imer Penaloza.  TT-4 Aff., ¶ 216; TT-5 Aff., ¶ 256 (citing 14-MJ-318 (TNL)).  However, on May 6, 2014, Imer Penaloza started using TT-2 and deactivated PP4, which disabled the GPS tracking of that device.  Id.

On May 7, 2014, Magistrate Judge Leung authorized GPS tracking for TT-2, used by Imer Penaloza.  TT-4 Aff., ¶ 217; TT-5 Aff., ¶ 257 (citing 14-MJ-334 (TNL)). However, Imer Penaloza has discontinued use of this phone.  Id.

On May 7, 2014, tracking was authorized on a phone used by a Penaloza DTO associate named Ramos, but law enforcement did not execute this warrant.  TT-4 Aff., ¶ 218; TT-5 Aff., ¶ 258 (citing 14-MJ-333 (TNL)).

On May 16, 2014, law enforcement obtained authorization for the use of a phone analyzer to identify unknown phones used by Imer Penaloza.  TT-4 Aff., ¶ 220; TT-5 Aff., ¶ 260 (citing 14-MJ-367 (JSM)).  The phone analyzer did not uncover any useful information.  Id.

On May 21, 2014, a GPS tracker was authorized for TT-1, which law enforcement used to locate Imer Penaloza and to identify locations frequented by him. TT-4 Aff., ¶ 221; TT-5 Aff., ¶ 261 (citing 14-MJ-381 (JSM)).  Imer Penaloza has discontinued use of this phone, and, therefore, GPS tracking is no longer available.  Id.

On June 17, 2014, law enforcement installed an authorized vehicle tracking device on a vehicle used by co-defendant Molina-Carranza.  TT-4 Aff., ¶ 222; TT-5 Aff., ¶ 262 (citing 14-MJ-488 (JJK)).  Subsequent police surveillance revealed that other unknown parties were using this vehicle, and Molina-Carranza has not been seen operating the silver Jeep Liberty since.  Id.

On June 19, 2014, Magistrate Judge Keyes authorized use of a vehicle tracking device on vehicle operated by co-defendant Perez-Arenas.  TT-4 Aff., ¶ 223; TT-5 Aff., ¶ 263 (citing 14-MJ-492 (JJK)).  Special Agent Hamblen did not state whether the device has yielded any useful information.

In the days following June 20, 2014, law enforcement officers identified a red Honda Civic with Minnesota plates XXXNLJ, driven by Izazaga-Pascacio. TT-4 Aff., ¶ 224; TT-5 Aff., ¶ 264  On June 24, 2014, officers obtained authorization for a vehicle tracking device on this vehicle. Id. (citing 14-MJ-509 (JJK)). Special Agent Hamblen did not indicate whether law enforcement executed the warrant or whether any information was collected from its use.

On June 25, 2014, law enforcement received authorization to use a phone analyzer device to identify unknown phones used by Izazaga-Pascacio. TT-4 Aff., ¶ 225; TT-5 Aff., ¶ 265 (citing 14-MJ-511 (FLN)). The device revealed a previously unknown phone associated with Izazaga-Pascacio, but an examination of toll records showed that Izazaga-Pascacio used this phone primarily for family communication. Id., p. 133.

On June 25, 2014, Magistrate Judge Franklin Noel authorized use of a phone analyzer device on Imer Penaloza, but the device did not uncover any useful information. TT-4 Aff., ¶ 226; TT-5 Aff., ¶ 266 (citing 14-MJ-510 (FLN)).

On July 14, 2014, law enforcement obtained search warrants for two cell phones seized from an associate of the Penaloza DTO on July 1, 2014. TT-4 Aff., ¶ 227; TT-5 Aff., ¶ 267 (citing 14-MJ-552 (SER)). These warrants have not been executed, and, in any event, Special Agent Hamblen anticipated a significant delay associated with the examination of data from these phones. Id.

On July 14, 2014, GPS tracking was authorized for two cell phones previously intercepted over TT-2. TT-4 Aff., ¶ 228; TT-5 Aff., ¶ 268 (citing 14-MJ-551 (SER)). The phones had been used to launder $60,000 by Imer Penaloza and Ramos. Id. However,

Special Agent Hamblen reported that the phones had been turned off, and law enforcement agents have not received any information from the GPS tracking device. Id.

In the TT-5 Affidavit, Special Agent Hamblen attested that on August 5, 2014, law enforcement received authorization for GPS tracking of a cell phone used by co-defendant Aundray Lindsay, which was intercepted over TT-4.   TT-5 Aff., ¶ 269 (citing 14-MJ-615 (FLN)).   Special Agent Hamblen noted that the order was executed by the cell phone service provider on August 6, 2014, and law enforcement had not yet received sufficient data to determine the investigative value of GPS tracking on this phone. Id., p. 134.

Special Agent Hamblen indicated that tracking devices had provided useful information as to the locations associated with the Penaloza DTO, but they did not reveal whether these locations are criminal in nature.   TT-4 Aff., ¶ 230; TT-5 Aff., ¶ 271. Therefore, Special Agent Hamblen believed that tracking would be most effective when combined with the interception of communications.   TT-4 Aff., ¶ 231; TT-5 Aff., ¶ 272.

### 11.    Public Records

Special Agent Hamblen attested that, during the course of this investigation, law enforcement officers searched public records for information as to the locations of target residences, stash locations, and storage lockers, as well as information on bank affiliations, utility records, phone affiliations, and vehicle title transfers.   TT-4 Aff., ¶ 232; TT-5 Aff., ¶ 273.   These searches uncovered few useful records due to the belief that members of the Penaloza DTO actively disguised the use or ownership of traceable items to avoid detection by law enforcement.   TT-4 Aff., ¶ 233; TT-5 Aff., ¶ 274.

### 12. Pen Registers, Trap-and-Trace Devices, Toll Analysis and Subscriber Information

Special Agent Hamblen stated that courts have authorized the use of pen registers and trap-and-trace devices on phones associated with Penaloza-Romero, Izazaga-Pascacio, Imer Penaloza, and Ramos.  TT-4 Aff., ¶ 234, 235; TT-5 Aff., ¶ 275, 276.  For example, on November 26, 2013, law enforcement obtained authorization to use a pen register and trap-and-trace device on phone number 320-455-XXXX, a phone used by Penaloza-Romero.  TT-4 Aff., ¶ 236; TT-5 Aff., ¶ 277 (13-MJ-791 (AJB)).

On May 2, 2014, a court authorized use of a pen register and trap-and-trace device on PP4, a phone used by Imer Penaloza.  TT-4 Aff., ¶ 237; TT-5 Aff., ¶ 278.  However, on May 6, 2014, Imer Penaloza began using TT-2 and discontinued use of PP4. Id.

On May 7, 2014, law enforcement received permission to use a pen register and trap-and-trace on TT-2.  TT-4 Aff., ¶ 238; TT-5 Aff., ¶ 279 (citing 14-MJ-335 (TNL)).  However, on May 16, 2014, Imer Penaloza told SPPD-UC to begin contacting him on TT-1. Id.

On May 21, 2014, a pen register and trap-and-trace device was authorized on TT-1, which was used by Imer Penaloza.  TT-4 Aff., ¶ 239; TT-5 Aff., ¶ 280 (citing Case No. 14-MJ-382 (JSM)).  Special Agent Hamblen did not indicate whether this device uncovered any useful information.

Special Agent Hamblen attested that law enforcement officers would continue to use pen registers and trap-and-trace devices during this investigation.  TT-4 Aff., ¶ 240; TT-5 Aff., ¶ 281.  However, the use of this technology has provided only a list of numbers called and did not reveal the identities of the persons called or the nature of

the conversations.  Id.  In addition, Special Agent Hamblen stated that, based on his training and experience, narcotic traffickers often register telephones in fictitious names to thwart law enforcement.  Id.

### 13.  Mail Cover Requests

In February, 2014, Special Agent Hamblen contacted a United States Postal Inspector to request a mail cover[15] on Penaloza-Romero's residence.  TT-4 Aff., ¶ 243; TT-5 Aff., ¶ 284.  According to Special Agent Hamblen, the Inspector conducted an internal review of mail received at Penaloza-Romero's residence in February, 2014.  Id. The Inspector indicated that no unusual packages or mail had been delivered to Penaloza-Romero's residence.  Id.  The Inspector explained that mail received at this location was mass or commercially produced correspondence, which is not suspected of criminal activity.  Id.  Special Agent Hamblen concluded that Penaloza-Romero was not using the mail to further his drug trafficking business.  TT-4 Aff., ¶ 244; TT-5 Aff., ¶ 285.  Special Agent Hamblen also attested that a mail cover is not possible for Izazaga-Pascacio because law enforcement have not been able to identify Izazaga-Pascacio's residence in Minnesota, and because Izazaga-Pascacio appears to stay at multiple addresses.  TT-4 Aff., ¶ 245; TT-5 Aff., ¶ 286.

In any event, Special Agent Hamblen did not believe use of a mail cover would accomplish the goals of the investigation, as law enforcement has no information

---

[15]    A mail cover is "a service provided by the United States Postal Service whereby a list of all the sender and receiver names and addresses on each piece of mail received at a particular location can be obtained.  The list is compiled by the mail carrier who would deliver the mail to the target location, and then the list would be provided to a United States Postal Inspector, who would provide the list to [Special Agent Hamblen]."  TT-4 Aff., ¶ 242; TT-5 Aff., ¶ 283.

suggesting that the Penaloza DTO ever used the mail to conduct illegal activity.  TT-4 Aff., ¶ 246; TT-5 Aff., ¶ 287.

### 14.  Financial Investigation

In 2011, law enforcement launched a financial investigation into the assets and movement of money by various members of the Penaloza DTO.  TT-4 Aff., ¶ 247; TT-5 Aff., ¶ 288.  The investigation revealed that the Penaloza DTO has no significant assets and does not use traditional means of transferring the proceeds of their illegal activities. Id.

Special Agent Hamblen stated that the interception of calls over TT-2 and TT-3 uncovered the use of money transfers through banks and the wire transfer of funds through money remitters.  TT-4 Aff., ¶ 248; TT-5 Aff., ¶ 289.  Grand jury subpoenas were issued to compel production of these records.  Id.

Special Agent Hamblen attested that intercepted calls from TT-2 and TT-3 produced very limited financial information.  TT-4 Aff., ¶ 249; TT-5 Aff., ¶ 290.  In the TT-5 Affidavit, Special Agent Hamblen noted that the interception of TT-4 had failed to generate any information about Penaloza-Romero's money laundering practices.  TT-5 Aff., ¶ 291.

Special Agent Hamblen indicated that the ongoing financial investigation revealed that the Penaloza DTO had been transferring funds to Mexico using money services such as MoneyGram and Western Union.  TT-4 Aff., ¶ 251; TT-5 Aff., ¶ 293. These money services flagged many transactions as suspicious or consistent with the attempt to avoid law enforcement detection.  Id.  Special Agent Hamblen further attested that the Penaloza DTO uses professional bulk cash smugglers to physically

transport money to co-conspirators.  TT-4 Aff., ¶ 252; TT-5 Aff., ¶ 294.  Because these methods do not leave a paper trial, Special Agent Hamblen believed that conventional financial investigation techniques would not be effective in investigating the Penaloza DTO's activities.  Id.  Special Agent Hamblen stated that electronic and wire interception would be an effective means to track the Penaloza DTO's money and to learn the identities of those involved in the conspiracy.  Id.

**B.**    **Discussion**

The application for and issuance of wiretaps is governed by 18 U.S.C. § 2518, which states, in relevant part:

(1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the applicant's authority to make such application. Each application shall include the following information:

(a) the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

****

(3) Upon such application the judge may enter an ex parte order, as requested or as modified, authorizing or approving interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting (and outside that jurisdiction but within the United States in the case of a mobile interception device authorized by a Federal court within such jurisdiction), if the judge determines on the basis of the facts submitted by the applicant that--

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

\*\*\*

18 U.S.C. § 2518(1), (3).

The necessity requirement of § 2518 insures "'that wiretaps are not routinely employed as the initial step in an investigation.'" United States v. Milliner, 765 F.3d 836, 839 (8th Cir. 2014) (quoting United States v. Jackson, 345 F.3d 638, 644 (8th Cir. 2003)). "To satisfy the requirement, an application requesting a wiretap order must include 'a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.'" Jackson, 345 F.3d at 644 (quoting 18 U.S.C. § 2518(1)(c)). However, the necessity requirement "'does not require that law enforcement officers exhaust all possible techniques before applying for a wiretap.'" United States v. Turner, 781 F.3d 374, 383 (8th Cir. 2015) (quoting United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990)). "'[I]f law enforcement officers are able to establish that conventional investigatory techniques have not been successful in

exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied.'" Milliner, 765 F.3d at 839 (quoting United States v. West, 589 F.3d 936, 939 (8th Cir. 2009)).

In this case, the wiretap was not the first step in the investigation of Penaloza-Romero and the Penaloza DTO. To the contrary, Special Agent Hamblen attested that law enforcement agents had initially employed several traditional techniques to achieve the goals of the investigation, such as confidential informants, controlled purchases, physical surveillance, undercover agents, previously authorized wiretaps, search warrants, grand jury subpoenas, trash searches, covert cameras, GPS tracking, pen registers, public records, mail covers, and financial investigation. Special Agent Hamblen thoroughly set forth the information obtained from each of these investigative techniques, the information these techniques failed to produce, and why further use of these techniques would not produce additional relevant information or would be too dangerous to employ.

For example, Special Agent Hamblen stated that previously authorized wiretaps were unlikely to generate new information because the targeted phones had been turned off, disconnected, or lost.

As to confidential informants, Special Agent Hamblen noted that although CI-1 had provided some information regarding Penaloza-Romero, it was too dangerous for CI-1 to continue to deal with the Penaloza DTO. Other confidential informants had either been exposed as government agents, cut off contact with law enforcement, or were not close enough to Penaloza-Romero to learn any useful information.

Special Agent Hamblen reported that physical surveillance had been unsuccessful because Penaloza-Romero and his associates frequently employed counter-surveillance techniques and were keenly aware of when they were being followed by law enforcement.

With respect to undercover agents, Special Agent Hamblen attested that SPPD-UC had successfully been introduced to the Penaloza DTO but was unlikely to be trusted with the information necessary to achieve the goals of this investigation because he is not a member of the Penaloza family or a long-term associate of the DTO.

Special Agent Hamblen indicated that search warrants have been ineffective because members of the Penaloza DTO did not store contraband in one place for long. Thus, by the time a warrant was executed, the evidence had already been moved.

Interviews with various acquaintances of the Penaloza DTO yielded some information, but not enough to achieve the goals of the investigation. In addition, Special Agent Hamblen believed that interviewing members of the Penaloza DTO via grand jury subpoenas would alert the organization to the Government's investigation and, in any event, would not likely produce results because the interviewees would invoke their Fifth Amendment privileges or lie under oath.

Special Agent Hamblen stated that trash searches have been unsuccessful because the subjects of investigation maintained multiple residences or lived in apartment buildings with communal trash receptacles. Special Agent Hamblen also indicated that trash searches at Izazaga-Pascacio's residence in Fresno, California and Imer Penaloza's residences in Minnesota produced nothing of relevance to the investigation.

Special Agent Hamblen noted that covert cameras outside Penaloza-Romero's business and at various locations associated with the Penaloza DTO helped law enforcement agents identify persons associated with the conspiracy.  However, the cameras did not reveal the nature or purpose of meetings or anything that happened inside the buildings.

Special Agent Hamblen indicated that GPS tracking of vehicles and phones used by members of the Penaloza DTO has been difficult to implement.  Special Agent Hamblen explained that both Penaloza-Romero and Izazaga-Pascacio were involved in the automobile trade, which allowed them to frequently change vehicles and avoid surveillance.  In addition, members of the Penaloza DTO continually acquired new cell phones and deactivated their old ones.  Moreover, although GPS tracking could help law enforcement identify locations associated with the Penaloza DTO, it could not reveal the nature of meetings or activity that happened at these locations.

Special Agent Hamblen noted that public records contained very little information with respect to the Penaloza DTO.  Special Agent Hamblen believed that the Penaloza DTO purposely disguised the ownership of any items that might be traced through public records.

The use of pen registers and trap-and-trace devices had been largely frustrated because members of the Penaloza DTO regularly acquired new phones and deactivated old ones.  In any event, Special Agent Hamblen stated that pen registers and trap-and-trace devices revealed only a list of phone numbers and did not determine the nature or content of conversations.

Special Agent Hamblen attested that the use of mail covers were not productive in this investigation because law enforcement had no indication that the Penaloza DTO conducted illegal activity through the mail.  In addition, mail inspections at Penaloza-Romero's residence revealed only mass or commercially produced mail.

Lastly, Special Agent Hamblen indicated that the technique of financial investigation had not been successful because the Penaloza DTO did not have significant assets and used non-traditional methods of transferring funds, such as MoneyGram, Western Union, or professional bulk cash smugglers.  These methods left no paper trail for law enforcement to follow.

Based on Special Agent Hamblen's statements in the TT-4 and TT-5 Affidavits, the Court concludes that law enforcement officers reasonably exhausted their attempts to use traditional investigative techniques to identify and locate Penaloza-Romero, the other members of the conspiracy, and the scope and extent of its activities.  The affidavits contain full and complete statements as to why other traditional investigation techniques would not provide additional information as to the identities of members of the conspiracy, the methods of money laundering used by the Penaloza DTO, or the source and location of illegal drugs.  As such, the Court finds that the Government has met its statutory duty with respect to a statement of necessity, and recommends that Penaloza-Romero's motion to suppress the evidence obtained from TT-4 and TT-4 applications be denied.

## IV.    RECOMMENDATON

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress [Docket No. 146] be **DENIED**.


Dated: May 5, 2015                                    *s/ Janie S. Mayeron*
                                                      JANIE S. MAYERON
                                                      United States Magistrate Judge


### NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **May 20, 2015**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court and is therefore not appealable directly to the Circuit Court of Appeals.